**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DENNIS STRUTTON,<br><br>Plaintiff,<br><br>v.<br><br>DONNA ANDERSON and<br>GEORGE KILLIAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:23-CV-01134-SPM |

**MEMORANDUM OPINION**

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 83) and Defendants' Motion to Strike Plaintiff's Affidavit (Doc. 101). The motions have been fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 34). For the following reasons, the Motion to Strike will be granted in part and denied in part, and the Motion for Summary Judgment will be granted.

## I. DEFENDANTS' MOTION TO STRIKE

Defendants move to strike five paragraphs of the affidavit Plaintiff submitted in opposition to Defendants' motion for summary judgment: three paragraphs on the ground that they conflict with Plaintiff's deposition testimony and two paragraphs on the ground that they are not based on Plaintiff's personal knowledge.

### A. Statements that Defendants Argue Conflict with Plaintiff's Deposition Testimony (Paragraphs 4, 9, and 12)

The Court first considers Defendants' argument that Paragraphs 4, 9, and 12 of Plaintiff's affidavit should be stricken under the sham affidavit rule because they contradict his prior

deposition testimony. "It is well-settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *Button v. Dakota, Minn. & E.RR. Corp*, 963 F.3d 824, 830 (8th Cir. 2020) (quoting *Bass v. City of Sioux Falls*, 232 F.3d 615, 618 (8th Cir. 1999)). "An affidavit is a sham affidavit if it contradicts prior testimony or is a 'sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before.'" *Id.* (quoting *Bass*, 232 F.3d at 618). "However, if the affidavit merely explains portions of a prior deposition that may have been unclear, it is not a sham affidavit." *Id.* (citing *City of St. Joseph v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006)).

1. *Paragraph 4: "I am not a pervert or malingerer."*

Defendants argue that Paragraph 4 ("I am not a pervert or malingerer.") is inconsistent with Plaintiff's deposition testimony. *See* Affidavit of Dennis Strutton (July 2, 2026) ("Pl. Aff."), Doc. 93-1; Deposition of Dennis Strutton (Aug. 20, 2025) ("Pl. Dep."), ECF No. 95-2, at 130 ("I mean, if we're trying to set a precedent I'm a pervert that has aggression issues, I mean, I've never denied that."); 84-85 (admitting that he had been described as being a malingerer). The Court will deny the motion to strike this paragraph. First, for the reasons stated in Plaintiff's opposition, a reading of Plaintiff's deposition as a whole suggests that Plaintiff was describing words that have been used to describe him rather than accepting labels for himself, especially as to the term "malingerer," so the Court finds no clear contradiction. Second, whether Plaintiff is a "pervert" or a "malingerer" has no bearing on any of the issues presented in the motion for summary judgment and will not be considered by the Court in any way in assessing the motion for summary judgment. The motion to strike Paragraph 4 is therefore moot.

2. *Paragraph 9: "Before 2002, I was taking classes, however, the treatment team ended access to those."*

Defendants argue that Paragraph 9 ("Before 2002, I was taking classes, however, the

treatment team ended access to those.") is inconsistent with Plaintiff's prior deposition testimony, in which he testified that he took classes in 2012. In his opposition, Plaintiff appears to admit that his vocational training ended in 2012 rather than 2002. Because there appears to be no dispute that Paragraph 9 is inaccurate and conflicts with Plaintiff's deposition testimony, the Court will grant the motion to strike Paragraph 9 from Plaintiff's affidavit.

*3. Paragraph 12: "I called the Missouri Department of Mental Health, and the phone operator transferred me at their discretion. I did not abuse my advocacy phone."*

Defendants argue that Paragraph 12 ("I called the Missouri Department of Mental Health, and the phone operator transferred me at their discretion. I did not abuse my advocacy phone.") should be stricken because it is inconsistent with Plaintiff's prior deposition testimony. For the reasons stated in Plaintiff's response to the motion to strike, the Court finds no contradiction between Plaintiff's prior deposition testimony and Paragraph 12 of Plaintiff's affidavit. Both are consistent with Plaintiff's version of what happened during this call: that Plaintiff chose the advocacy phone's option to be connected to Jefferson City, that he asked to be connected to the director (which had not been an issue in the past), that he gave the name of the last director he knew, and that (without Plaintiff's realizing it would happen) the operator connected him to the former director's personal cell phone instead of transferring the call to the office of the current director. *See* Pl. Dep. at 71-74. Paragraph 12 may be inconsistent with Defendants' version of events, but it is not inconsistent with Plaintiff's deposition testimony. Defendants' motion to strike Paragraph 12 will be denied.

**B. Statements that Defendants Argue Were Made Without Personal Knowledge (Paragraphs 2 and 6)**

Defendants move to strike Paragraph 2 ("My treatment is not individualized because treatment is uniform for all patients.") and Paragraph 6 ("Treatment Levels at S.O.R.T.S. only

meet with Privilege levels.") because Plaintiff lacks personal knowledge regarding SORTS policies or other residents' treatment plans. Defendants rely on Federal Rule of Evidence 602, which provides, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. *See also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). In his opposition, Plaintiff argues that he may testify about his personal observations regarding the uniformity of treatment of other patients and the link between treatment and privilege levels.

On the current record, it appears that Plaintiff may be able to establish that, based on his own personal observations and experiences while a resident at SORTS, he has some personal knowledge of the level of uniformity of treatment provided to SORTS patients and of the link between treatment levels and privilege levels. Thus, the motion to strike Paragraphs 2 and 6 will be denied.

For the reasons stated above, Defendants' motion to strike will be denied as to Paragraphs 2, 4, 6, and 12, and granted as to Paragraph 9.

## II. Defendants' Motion for Summary Judgment

### A. Factual Background[1]

In 2002, after Plaintiff pleaded guilty to two counts of forcible sodomy and first-degree

---

[1] Except as otherwise specified, these facts are taken from Defendants' Statement of Uncontroverted Material Facts, Doc. 84-1 ("DSUMF") and Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts and Plaintiff's Statement of Uncontroverted Material Facts, Doc. 93 ("PSUMF"). The facts are viewed in the light most favorable to Plaintiff. In Plaintiff's response to Defendants' statement of facts, Plaintiff purports to deny several of the facts

child molestation, he was legally deemed a Sexually Violent Predator ("SVP") by a Missouri court. DSUMF ¶ 1. He was ordered to remain civilly detained in the Missouri Department of Mental Health's Sexual Offender's Rehabilitation Treatment Services ("SORTS") program.[2] *Id.* Individuals civilly confined at SORTS facilities receive treatment for their mental abnormalities related to their sexual offenses, also called their "index crimes." Declaration of George Killian (April 30, 2026), Doc. 95-1, ¶ 4. A resident's treatment plan includes accepting responsibility for his index crimes and sexual offenses, implementing mitigation tactics and behaviors, identifying risk factors, and abiding by the rules of the facility. DSUMF ¶ 3. According to Plaintiff, treatment is uniform for all patients and is not individualized. Pl. Aff. ¶ 2.

SORTS residents are given a privilege level that is determined based on their conduct and treatment progression, with Red Level being the most restrictive and Gold Level being the least restrictive before conditional release out of SORTS. DSUMF ¶ 10. Residents with privilege levels below Gold Level do not have access to the internet except for legal work purposes, unless they have received permission for internet access pursuant to a completed request to their treatment team. DSUMF ¶ 14. Residents who work through their treatment and progress in their rehabilitation may reach Gold Level privilege, which allows greater, but still monitored, access to the internet. DSUMF ¶ 12. All residents, regardless of privilege level, may access the web-based

asserted, usually citing generally his affidavit. Where the affidavit controverts the statement of fact, the Court views the fact in the light most favorable to Plaintiff after consideration of the affidavit. Where the affidavit does not controvert the fact asserted, the Court sets forth the fact as asserted by Defendants. The Court omits from its discussion facts presented by both sides that are irrelevant to the Court's analysis.

[2] Under Missouri law, a person who is determined to be a "sexually violent predator" shall be "committed to the custody of the director of the department of mental health for control, care and treatment until such time as the person's mental abnormality has so changed that the person is safe to be at large." Mo. Rev. Stat. § 632.495.2.

library computers to conduct legal work and access legal sites like Lexis Nexis. DSUMF ¶ 17.

The Director of Treatment Services at SORTS, George Killian, testified that allowing Plaintiff and other residents to access the internet when they are not at the proper treatment stage could be potentially harmful for several reasons. Deposition of George Killian (April 30, 2026) ("Killian Dep."), Doc. 94-1, at 60. One concern is that the resident could look up information of a deviant nature. *Id.* at 42, 49. For example, if Plaintiff were to have access to a website like WebMD, he might be able to look up images of children, body parts, or cartoon drawings that might be considered deviant for an individual at his treatment stage. *Id.* at 42-43. A resident going to one website could also then go another website to look up content of a deviant nature. *Id.* at 42, 57-58. Some residents who have attained Gold Privilege have abused the internet once given access, searching for child pornography and the dark web. DSUMF ¶ 16. Plaintiff admits someone could use the internet to threaten, groom, and/or manipulate others. DSUMF ¶ 47. Killian testified that any sort of monitoring of the internet would require a cost and that individuals might be able to find a way around such monitoring. Killian Dep. at 50. Killian is unaware of inexpensive hardware such as Brick that restricts smartphones. PSUMF ¶ 20.

Plaintiff is currently at the Red Level Privilege but during the course of this lawsuit has been at the Yellow and Green levels. DSUMF ¶ 11. Plaintiff's treatment team does not believe that he is ready for unrestricted internet access because he refuses to acknowledge or accept responsibility for his index crimes,[3] will not identify risk factors or mitigation tactics, and frequently attempts to circumvent rules and procedures of the facility and his treatment in order to get his way. DSUMF ¶ 9. In 2022, Plaintiff assaulted a SORTS staff member. DSUMF ¶ 32.

[3] The reason Plaintiff has not acknowledged responsibility for his index crimes is that he cannot recall them due to a head injury. Pl. Aff. ¶ 3.

Plaintiff admits that he has received problem behavioral worksheets for inappropriate boundaries and attempts to solicit female staff, for exhibiting grooming behavior toward other residents, for abuse of the advocacy phone, and for manipulating a lithium battery. DSUMF ¶¶ 34-36, 43. However, Plaintiff disputes the facts underlying some of these worksheets; he contends that he did not actually abuse the advocacy phone or manipulate a battery. *Id.*[4]

At his privilege level, Plaintiff is not permitted to access several internet resources that he believes would be helpful to him, including the Mayo Clinic, WebMD, Rosetta Stone (for learning languages), free online Ivy League courses, telehealth resources, and crossword puzzle and hobby websites. PSUMF ¶¶ 14-16, 18, 22-23. Plaintiff and other SORTS residents do have access to over 80 television channels; access to magazines and newspapers provided by the facility, the ability to pay for subscriptions to other newspapers and magazines with treatment plan approval, the ability to maintain a personal collection of books, movies, and a radio; and the ability to place outside orders with vendors such as Amazon. DSUMF ¶¶ 18-21, 24. However, several of these cost money, and Plaintiff can only earn about $20 per month and must depend on money from family and friends. PSUMF ¶¶ 8-10. The online resources would be free or less expensive. *Id*. at ¶¶ 24, 26. Additionally, Plaintiff is prevented from subscribing to certain newspapers and magazines, can only have a certain number of books, and can only watch PG-13 movies. Pl. Aff. ¶¶ 7-8. Plaintiff can write letters and correspond with people regardless of whether they are on his approved visitor and telephone lists. Killian Dep. at 73-74. He engages in discussions about current events and his opinions with staff and other residents. DSUMF ¶ 51.

---

[4] Defendants make several other assertions regarding Plaintiff's past misconduct. However, viewing the evidence in the light most favorable to Plaintiff, the Court does not find it undisputed that Plaintiff actually engaged in those acts of misconduct, so the Court assumes for purposes of this motion that he did not.

Plaintiff now asserts claims under 42 U.S.C. § 1983 against Defendants George Killian (Director of Treatment Services at SORTS) and Donna Anderson (Chief Operating Officer of SORTS), in their official capacities only.[5] Plaintiff alleges that Defendants violated his First Amendment rights by refusing to allow him to access the internet. He asks the Court to (1) provide all individual SORTS residents access to the internet; (2) allow all SORTS residents who have no internet-related offenses to have unlimited access to the internet and social media; (3) provide Plaintiff with a personal laptop equal to all those in SORTS; and (4) allow Plaintiff a subscription to the Great Courses, at the State's expense, for the duration of his stay in SORTS. Am. Compl., Doc. 12, at 7. He does not seek damages.

**B. Legal Standard**

The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). "A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Cameron v. City of Des Moines*, 168 F.4th 522, 527 (8th Cir. 2026) (quoting *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a

[5] Plaintiff's individual-capacity claims were previously dismissed. Doc. 44.

genuine issue for trial. " *Id.* (quoting *Celotex*, 477 U.S. at 324). "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Binkley v. Entergy Operations, Inc.*, 602 F.3d 928, 931 (8th Cir. 2010) (quoting *Godfrey v. Pulitzer Pub. Co.*, 276 F.3d 405, 412 (8th Cir. 2002)).

**C. Discussion**

Defendants argue that they are entitled to summary judgment because the undisputed facts show that the regulation restricting and limiting Plaintiff's internet access is reasonably related to the government's legitimate nonpunitive interests in rehabilitation and treatment of violent sexual predators held in civil detainment. They also argue that they are entitled to sovereign immunity and Eleventh Amendment immunity. The Court will address the immunity question first.

*1. Sovereign Immunity and the Eleventh Amendment*

Defendants argue that because Plaintiff's claims are brought against Defendants in their official capacities, the claims are against the state and are barred by sovereign immunity and the Eleventh Amendment. "States generally enjoy sovereign immunity in federal courts from suits brought by citizens of other states and their own citizens." *Bio Gen LLC v. Sanders*, 142 F.4th 591, 604 (8th Cir. 2025). *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). "Claims against state officials acting in their official capacities are considered claims against the State and therefore subject to sovereign immunity." *Bio Gen LLC*, 142 F.4th at 604. *See also Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (the Eleventh Amendment's bar against damages actions against a State in federal court "remains in effect when State officials are sued for damages in their official

capacity" because "a judgment against a public servant in his official capacity imposes liability on the entity that he represents") (internal quotation marks omitted).

There is an exception to the general rule that state officials sued in their official capacities are immune from suit: "Under the *Ex Parte Young* doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). *See also Filyaw v. Corsi*, 150 F.4th 936, 941 (8th Cir. 2025) ("The *Ex parte Young* doctrine rests on the premise that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.") (quoting *Elder v. Gillespie*, 54 F.4th 1055, 1062 (8th Cir. 2022)). *See also Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009) ("In accordance with *Ex Parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment bars damages claims against the states, but generally does not bar claims for prospective injunctive relief against public officials in their official capacities."). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018) (internal quotation marks omitted). Additionally, the official sued must have "some connection with the enforcement" of the challenged law. *Bio Gen LLC*, 142 F.4th at 604.

Here, Plaintiff asserts claims against state officials in their official capacities based on an ongoing violation of his rights under the federal constitution. He seeks only prospective injunctive relief, not damages. The record suggests that as SORTS's Chief Operating Officer and SORTS's Director of Treatment Services, Defendants have "some connection" with enforcement of the

internet restriction on SORTS, and Defendants do not argue otherwise. The *Ex Parte Young* exception therefore applies, and the suit may go forward.

None of the cases cited by Defendants involved claims seeking injunctive relief against state officials in their official capacities for violations of federal law—the facts that trigger application of the *Ex parte Young* exception. Instead, they involved state law claims (rather than federal law claims), claims against the State of Missouri itself (rather than claims against an official), and/or claims for damages (rather than claims for injunctive relief). These cases are therefore distinguishable. *See B.A.B., Jr. v. Board of Educ. Of City of St. Louis*, 698 F.3d 1037, 1041-42 (8th Cir. 2012) (finding sovereign immunity barred state law claims brought against state official in her official capacity); *Taylor v. St. Louis County Bd. of Election Com'rs*, No. 4:07-CV-1544, 2008 WL 250367, at *2-*3 (E.D. Mo. Jan. 29, 2008) (same); *Fischer v. Steward,* No. 4:07-CV-1798, 2010 WL 147865, at *11 (E.D. Mo. 2010) (same); *Stubbs v. Missouri*, No. 4:22-CV-00507-SPM, 2022 WL 3042124, at *4 (E.D. Mo. Aug. 2, 2022) (finding sovereign immunity and the Eleventh Amendment barred claims seeking any kind of relief brought against the State of Missouri and barred claims seeking damages brought against state officials in their official capacities); *Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999) ("A claim for damages against a state employee in his official capacity is barred under the Eleventh Amendment."); *Lewis v. Clarke*, 581 U.S. 155, 163 (2017) (noting that "[d]efendants in an official-capacity action may assert sovereign immunity" but only addressing a claim for damages and not discussing *Ex Parte Young* or injunctive relief); *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016) (noting that a "plaintiff who sues public employees in their official, rather than individual, capacities sues only the public employer" but not addressing sovereign immunity, the Eleventh Amendment, or *Ex Parte Young*).

For the above reasons, the Court finds Defendants are not entitled to sovereign immunity or immunity under the Eleventh Amendment.

*2. Plaintiff's Claims that His First Amendment Rights Have Been Violated*

Plaintiff alleges that SORTS's policy of not allowing him to use the internet (except for legal purposes) use violates his First Amendment rights. The Court has not found any binding case law on the question of whether civilly committed individuals have a First Amendment right to access the internet. *See, e.g.*, *Rhodes v. Civ. Commitment Unit for Sexual Offenders*, No. C25-4020-LTS, 2026 WL 852131, at *5 n.5 (N.D. Iowa Mar. 27, 2026) ("No binding case law exists about whether [civilly committed individuals] have a right to access the internet generally.") (quoting *Daywitt v. Harpstead*, No. 20-CV-1743 (NEB/ECW), 2023 WL 6366610, at *5 (D. Minn. Sept. 29, 2023), *aff'd*, No. 24-1138, 2024 WL 4234951 (8th Cir. Sept. 19, 2024)). Some courts have found that limitation a civil detainee's use of the internet does not raise constitutional concerns at all. *See Banks v. Jesson*, No. 11-CV-1706 (SRN/JSM), 2016 WL 3566207, at *10 (D. Minn. June 27, 2016) (denying civil detainees' First Amendment claims and reasoning that the Minnesota Sex Offender Program's "limitations on detainees' use of computers, email, and the internet do not raise constitutional concerns"; finding in the alternative that the limitations were constitutional). Other courts have rejected a blanket rule that civil detainees have no First Amendment right to access the internet. *See Ivey v. Johnston*, No. 18-CV-1429 (PAM/DTS), 2019 WL 3334346, at *5-*6 (D. Minn. July 24, 2019), *report and recommendation adopted,* No. CV 18-1429 (PAM/DTS), 2019 WL 3987583 (D. Minn. Aug. 23, 2019).

In this case, Defendants do not argue that civil detainees have no First Amendment right to access the internet or that no constitutional concerns are raised by the SORTS internet policy. Instead, they argue that the policy is permissible under the legal standards that apply to regulations

that impinge on civil detainees' constitutional rights. Because the Court agrees with Defendants that the regulation is permissible even if it raises constitutional concerns, and in the absence of any briefing on the subject, the Court will assume, without deciding, that a policy limiting a civil detainee's access to the internet impinges on a civil detainee's First Amendment rights.

In the prison context, the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). This standard "is necessary if prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations." *Id.* (citation modified). To determine whether a regulation that impinges on an inmate's constitutional rights is reasonably related to a legitimate penological purpose, courts consider the following factors: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it; (2) whether alternative means of exercising the right remain open to prison inmates; (3) the impact accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there is a ready alternative to the regulation that would fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests. *Id.* at 89-90.

As Plaintiff points out, he is a not a prisoner, but a civilly committed person. Civilly committed persons are "entitled to more considerate treatment and conditions of confinement" than prison inmates, though their "liberty interests are considerably less than those held by members of a free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (internal quotation marks omitted). Although the Court has found no Eighth Circuit cases directly addressing the issue, several other courts have applied *Turner* to civil detainees, modifying the analysis to reflect that the government's legitimate interests with respect to civil detainees do not

include punishment. *See, e.g., Matherly v. Andrews*, 859 F.3d 264, 282 (4th Cir. 2017) (holding that a modified version of *Turner* applies to civil detainees that requires assessment of whether the regulation is "reasonably related to legitimate nonpunitive governmental interests"); *Pesci v. Budz*, 730 F.3d 1291, 1298 (11th Cir. 2013) ("[T]he government undoubtedly may justify a civil detention regulation based on its valid, rational connection to legitimate interests in institutional order, safety, and security and in the rehabilitation and treatment of civil detainees, but it may not justify a restraint on detainees' constitutional rights for reasons related to punitive conditions of confinement."); *Daywitt v. Harpstead*, No. 20-CV-1743 (NEB/ECW), 2023 WL 6366610, at *4 (D. Minn. Sept. 29, 2023) (noting that "as far as the Court is aware, every circuit to address the constitutional validity of a civil commitment program policy has identified *Turner* as the appropriate standard"; modifying the *Turner* analysis to assess the government's legitimate nonpunitive interests, including its "legitimate institutional and therapeutic interests"), *aff'd*, No. 24-1138, 2024 WL 4234951 (8th Cir. Sept. 19, 2024). *See also Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012) (applying *Turner* to a case involving civil detainees by agreement of the parties). As the Court noted in its prior order on Defendants' motion to dismiss, the Court agrees with this approach and finds that a modified version of *Turner* applies in this case. Plaintiff's First Amendment rights were not violated if, after application of the *Turner* factors, the Court can find that it is reasonably related to the government's legitimate nonpunitive interests, including its legitimate institutional and therapeutic interests.

In their motion, Defendants argue that application of the modified *Turner* factors to the undisputed facts here shows that the restriction does not violate Plaintiff's First Amendment rights. Despite Defendants' reliance on *Turner* and the Court's prior finding that *Turner* applies to Plaintiff's claims, Plaintiff does not acknowledge *Turner* or its progeny and does not discuss the

factors set forth in those cases. Instead, the only case cited in Plaintiff's brief is *Packingham v. North Carolina,* 582 U.S. 98, 104-08 (2017), which addressed the First Amendment rights of sex offenders but which did not address the special considerations applicable to *detained* sex offenders. Plaintiff does not explain why the standard articulated in *Packingham* should apply here instead of those articulated in *Turner*, and the Court agrees with the other courts that have expressly found that it does not. *See Wahl v. Jumper*, No. 21-2292, 2022 WL 2383862, at *2 (7th Cir. July 1, 2022) (rejecting a civilly detained sexually violent person's argument that *Packingham* applied to his First Amendment claims; stating, "[T]he restriction in *Packingham* applied to noncustodial sex offenders; it did not purport to limit *Turner*, the framework that we use to assess regulations that apply to persons like Wahl in detention."); *Ivey v. Johnston*, No. CV 18-1429 (PAM/DTS), 2021 WL 120746, at *2 (D. Minn. Jan. 13, 2021) ("*Packingham* does not apply to Plaintiff, as he is civilly committed and subject to different standards than the individuals discussed in that case."); *Hall v. Carner*, No. 2:24-CV-282-JLB-NPM, 2025 WL 1755079, at *8 (M.D. Fla. June 3, 2025) (finding *Packingham* did not apply to a civilly committed sex offender; stating, "It is axiomatic that the security risks posed by a confined sexually violent predator such as Plaintiff are not analogous to those of a registered sexual offender on supervised release, determined ready to live in the community."). Nevertheless, to the extent that Plaintiff's arguments address matters relevant to application of the modified *Turner* factors, the Court will consider them below.

**a. Whether there is a valid, rational connection between the regulation and SORTS's legitimate, nonpunitive governmental interests**

The Court first considers the first modified *Turner* factor: whether there is a valid, rational connection between the restrictions Defendants place on Plaintiff's internet use and the legitimate, nonpunitive governmental interests put forward to justify those restrictions. "The first factor

operates as a *threshold condition* that the [policy] must satisfy to pass constitutional muster." *Schmitt v. Rebertus*, 148 F.4th 958, 967 (8th Cir. 2025) (quoting *Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021)).[6] "Only if the policy satisfies this threshold requirement must the court determine the policy's constitutionality by balancing the remaining three factors." *Id.* (citation modified). "Generally, the [institution] bears the burden of proving the existence of a 'rational connection' between the challenged regulation and a legitimate government interest." *Sisney*, 15 F.4th at 1190. "This does not require proving that the regulation in fact advances the government interest, but it does require proving that the policymaker might reasonably have thought that it would." *Id.* at 1191 (internal quotation marks omitted). "Unless a rational connection between the regulation and the asserted interest is a matter of common sense, the [institution] must proffer some evidence to support the existence of such a connection." *Id.* (internal citations and quotation marks omitted). "[T]he rehabilitation of [civilly committed] sex offenders and institutional security of [the institution housing them] are legitimate government interests under *Turner*." *Stone v. Jesson*, Case No. 11-cv-0951 (WMW/HB), 2019 WL 7546630, at *5 (D. Minn. Dec. 3, 2019) (citation modified). *Accord Ivey*, 2021 WL 120746, at *2.

Defendants have offered evidence sufficient to support a valid, rational connection between the restrictions on internet usage placed on Plaintiff and the government's legitimate interest in the rehabilitation of sexually violent predators and SORTS institutional security. Defendants have

[6] Additionally, when a regulation restricts First Amendment rights, "it must . . . operate in a neutral fashion," and "the proffered mechanism by which the regulation promotes the government interest must be unrelated to the suppression of expression." *Sisney*, 15 F.4th at 1190. For example, "a prison may not censor literature advocating racial purity on the ground that exposure to racist ideas inhibits rehabilitation," but "a prison may censor depiction of nude or scantily clad minors on the ground that consumption of such images inhibits rehabilitation of sex offenders, not by exposing them to corrupting ideas, but by feeding their desires to perform criminal acts." *Id.* (internal quotation marks omitted). In this case, there is no dispute that the restriction operates in a neutral fashion.

produced evidence that SORTS personnel are concerned that residents (such as Plaintiff) who have not progressed sufficiently in their treatment programs could use the internet to view information that could harm their rehabilitation—both because allowing access to some websites might permit a resident to access other websites that contain deviant content and because images on seemingly innocuous websites might be considered deviant for a resident early in his treatment. The reasonableness of this concern is supported by the undisputed evidence that in the past, SORTS residents who have been given even limited access to the internet have used it to search for child pornography and the dark web. Access to such materials would interfere with institution's legitimate interests in rehabilitation of residents, maintaining institutional security, and preventing criminal activity. Defendants also point out that, as Plaintiff admits, someone could use the internet to threaten, groom, or manipulate others. Additionally, with respect to Plaintiff specifically, it is undisputed that Plaintiff has a history of solicitation, grooming, and breaking rules at the SORTS facility. These facts raise additional rational concerns that Plaintiff would, if given limited access to the internet, break the rules on internet usage in a way that could harm his rehabilitation and potentially permit him to harm others.

Taken together, this evidence is sufficient to show a valid, rational connection between the restriction on internet access and the SORTS's legitimate therapeutic and institutional interests. *See, e.g.*, *Ivey*, 2021 WL 120746, at *2 (finding, at the summary judgment stage, that a ban on internet use by civilly detained sex offenders was rationally related to legitimate institutional therapeutic interests where the defendants presented evidence of the institution's concerns that some residents would use the internet in ways that would be detrimental to their rehabilitation and institutional security, including by accessing counter-therapeutic stimuli, stalking and harassing others, and participating in criminal activity); *Herrick v. Quigley*, No. 315CV05016RBLKLS,

2016 WL 7324288, at *8 (W.D. Wash. Nov. 2, 2016) (finding, at the summary judgment stage, that the first *Turner* factor favored the defendants; stating, "Restricting computer functionality and capability of personal computers for the purpose of increasing the likelihood that [civilly committed sex offenders] complete their treatment plans and achieve their therapeutic goals, bears a rational relation to the [the institution's] institutional interests. Ensuring that [the institution's] residents adhere to their treatment plans is a legitimate goal, given the type of civil detention that is imposed on those residents. Preventing the introduction of illegal child pornography and other banned materials also furthers the [institution's] valid interest in maintaining institutional security and preserving internal order and discipline."), *report and recommendation adopted*, No. 315CV05016RBLKLS, 2016 WL 7243784 (W.D. Wash. Dec. 15, 2016), *aff'd,* 756 F. App'x 726 (9th Cir. 2019).

The rational connection between the policy and the therapeutic and institutional interests is further supported by the evidence that the policy is limited to those SORTS residents who have not yet been deemed ready for the Gold Privilege level because they exhibit concerning behaviors or have not yet progressed in their treatment. Plaintiff and other SORTS residents who work through their treatment plans and are deemed ready for the Gold Privilege level can be granted broader (but still monitored and restricted) internet access.

Plaintiff's arguments against the rational connection between the policy and the government's legitimate interests are unpersuasive. First, Plaintiff argues that blanket restrictions violate the Constitution and that Missouri "must only enforce specific, narrowly tailored restrictions." Doc. 94, at 4. This argument appears to be based on the standard articulated in *Packingham* for evaluating First Amendment claims brought by non-detained sex offenders. *See* 582 U.S. at 105-06. As discussed above, *Packingham* does not apply here. The question here is

not whether the restriction is "narrowly tailored" to serve a significant governmental interest, but whether it is "reasonably related to legitimate [government] interests." *Turner*, 482 U.S. at 89.

Second, Plaintiff emphasizes at length the benefits various websites could provide him. He argues that there is no rational basis for denying Plaintiff monitored access to online news that is more affordable than paper prescriptions, to foreign language learning sites that would strengthen his brain function and improve his mental health, to free online courses for his own development and education, to online telehealth therapy that could assist in his rehabilitation, or to online journaling that could improve his treatment. The Court will assume, for purposes of the instant motion, that Plaintiff would experience significant benefits from having access to these websites and that such access might benefit his treatment and rehabilitation. That does not change the Court's conclusion that the first factor favors Defendants. The facility need not "prov[e] that the regulation in fact advances the government interest" asserted, only that the policymaker "might reasonably have thought that it would." *Sisney*, 15 F.45h at 1191. *See also Banks v. Jesson*, No. 11-CV-1706 (SRN/LIB), 2017 WL 1901408, at *9 (D. Minn. May 8, 2017) (finding Plaintiff's attempts to dispute that the prohibitions at issue would in fact serve the institution's therapeutic or security interests were "beside the point" because "[t]he sole issue is whether [the restrictions] were reasonably related to [the institution's] legitimate interests, a determination that does not require factual findings that the regulations in fact serve their intended purposes."). For the reasons set forth above, a policymaker might reasonably think that a ban on most internet access for SORTS residents below a certain privilege level would serve the institution's legitimate interests.

Third, Plaintiff objects that some of Defendants' justifications for the internet policy relate to things that detainees *other than Plaintiff* have done or could do if given internet access. This objection is without merit. "The modified *Turner* test considers institutional interests as a whole

and does not require consideration of the individual dangerousness posed by each Plaintiff." *Daywitt v. Harpestead*, No. 20-CV-1743-NEB-ECW, 2023 WL 4850677, at *14 (D. Minn. July 28, 2023), r*eport and recommendation adopted sub nom*. *Daywitt v. Harpstead*, No. 20-CV-1743 (NEB/ECW), 2023 WL 6366610 (D. Minn. Sept. 29, 2023), *aff'd*, No. 24-1138, 2024 WL 4234951 (8th Cir. Sept. 19, 2024). Plaintiff cites no authority for the proposition that the SORTS policy must be justified under *Turner* on an individual basis for each detainee subject to the policy, and the Court has found none. *See id.* ("Plaintiffs cite no authority for the proposition that the modified *Turner* test is to be applied on an individual basis, and the Court rejects this argument.").

**b. Whether alternative means of exercising the right remain open to SORTS residents**

The Court next considers whether Plaintiff has alternative means of exercising his First Amendment rights. In assessing this factor, "the right in question must be viewed sensibly and expansively," and "courts should be particularly conscious of the measure of judicial deference owed to [government] officials in gauging the validity of the regulation." *Murchison v. Rogers*, 779 F.3d 882, 891 (8th Cir. 2015) (quotation marks omitted). "Alternatives to the type or amount of speech at issue need not be ideal . . . they need only be available." *Simpson v. Cnty. of Cape Girardeau*, 879 F.3d 273, 280 (8th Cir. 2018) (citation modified).

The undisputed evidence shows that this factor favors Defendants. The record shows that Plaintiff can access the information he seeks in numerous ways without having direct internet access: he has access to books, magazines, newspapers, CDs, movies, and religious goods; he has access to over 80 television stations; he has a radio and CD player; he can order additional materials through pre-approved vendors (including Amazon) or by having his family send him items; and he can ask staff to look things up for him on the internet. He also has the ability to express himself through discussions with staff and other residents and through writing letters and

corresponding with people outside of SORTS. Other courts have found similar evidence sufficient to support a finding that the second *Turner* factor favors the defendant at the summary judgment stage. *See Ivey*, 2021 WL 120746, at *2 (finding the second factor favored the defendant at the summary judgment stage where a civilly detained sex offender did not have internet access but had access to mail, telephone, newspapers, magazines, radio, and some television channels, where his family could print information from the internet and mail it to him, and where he could contact politicians via mail); *Daywitt v. Harpstead*, No. 20-CV-1743 (NEB/ECW), 2023 WL 6366610, at *6 (D. Minn. Sept. 29, 2023) (finding the second factor favored the defendant at the summary judgment stage where civilly detained sex offenders did not have access to the internet but had alternative means to access the information found on the internet because they could use conventional mail, communicate via telephone and in-person visits, read newspapers, watch television, and listen to the radio), *aff'd,* No. 24-1138, 2024 WL 4234951 (8th Cir. Sept. 19, 2024).

To the extent that Plaintiff attempts to address this factor in his briefing by arguing that internet resources are less expensive than the alternatives or (in the case of language learning) more effective than alternatives, his arguments suggest only the internet would be an ideal or more convenient way of accessing information, not that the information is not available to him. This is insufficient for purposes of the second *Turner* factor. *See Ivey*, 2021 WL 120746, at *2 ("Although Plaintiff seeks more convenient access to information found on the internet, he provides no authority that convenience is the constitutional standard."); *Simpson*, 879 F.3d at 280 ("Alternatives to the type or amount of speech at issue 'need not be ideal . . . they need only be available.").

**c. The impact accommodation of the asserted right will have on staff and other detainees, and on the allocation of institutional resources generally**

The Court next considers the impact accommodation of the asserted right will have on staff and other detainees and on the allocation of institutional resources generally. Neither party provides much evidence relevant to this factor. The evidence in the record shows that when SORTS does allow its Gold Privilege residents internet access, it monitors internet usage. Killian also testified that any internet monitoring will require a cost and that individuals might be able to find a way around the monitoring. The evidence also shows that even with current monitoring and with a limited number of residents having internet access, some access to inappropriate websites has occurred. Defendants argue that if Plaintiff were given internet access, staffing resources would be constrained to monitor resident internet usage and address any abuse thereof instead of actively treating the mental abnormalities of each resident. Plaintiff argues, on the other hand, that taxpayers already pay a full-time employee to be a digital monitor of patients at SORTS.

Based on the limited evidence provided, the Court finds this factor favors Defendants, though not strongly. Although Plaintiff points out that SORTS employs a digital monitor, Plaintiff points to no evidence that this employee could monitor internet usage for *all* residents at SORTS in addition to his current job duties without significantly impacting staffing or other resources at SORTS. Other courts have found similar unsupported assertions insufficient to show that the third factor favors a plaintiff at the summary judgment stage. *See Ivey*, 2021 WL 120746, at *2-*3 (finding third factor favored the defendant where "Plaintiff asserts that MSOP staff members could monitor clients' internet use in real time, yet presents no evidence or expert testimony that such supervision would not unreasonably burden MSOP.").

**d. Whether there is a ready alternative to the regulation that would fully accommodate the detainee's rights at a *de minimis* cost to valid institutional interests**

Finally, the Court considers whether there are ready alternatives to the regulation that would fully accommodate detainee's rights at a *de minimis cost* to valid institutional interests. "[T]he absence of ready alternatives is evidence of the reasonableness of [an institutional] regulation." *Turner*, 482 U.S. at 90. On the other hand, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* Plaintiff bears the "burden to not only provide an alternative to the policy, but to show it could be implemented with only *de minimis* costs." *Hughbanks v. Dooley*, No. CIV. 10-4064-KES, 2012 WL 346673, at *12 (D.S.D. Feb. 2, 2012) (citing *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1160 (10th Cir. 2007)). "This is not a 'least restrictive alternative' test: [institutional] officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91.

Plaintiff points out that every ward of the facility allows restricted internet access for LexisNexis. He argues that internet access can be easily monitored by Defendants with existing resources and notes that Missouri taxpayers already pay a full-time internet monitor to watch activity at SORTS. However, he provides no evidence of how this employee monitors digital activity at SORTS, whether the type of monitoring he currently does would be sufficient to address the valid institutional concerns identified by Defendants, or whether it would be feasible for this employee to effectively monitor internet usage for all residents at SORTS in addition to his current job duties. Additionally, the fact that the monitoring of internet access for even a limited number of SORTS residents has not been successful in preventing them from seeking out child pornography and the dark web further suggests that monitoring is not an easy alternative to the

limitation on internet access that will fully serve SORTS's legitimate goals. Plaintiff also mentions the existence of hardware devices (such as Brick) that may be used to restrict smart phones, but he does not offer any evidence about how such devices work, whether it would be feasible to use such devices at the SORTS facility, or whether such devices would sufficiently address Defendants' valid institutional interests.

In sum, the Court finds Plaintiff has not met his burden of showing that there is a ready alternative to the regulation that would fully accommodate the detainee's rights at a *de minimis* cost to valid institutional interests. Thus, the fourth factor favors Defendants. *See Ivey*, 2021 WL 120746, at *2-*3 ("Plaintiff presents no simple and cost-effective alternative that would provide MSOP clients internet access and also meet MSOP's objectives.").

For all of the above reasons, after considering all four *Turner* factors—all of which favor Defendants—the Court finds that the restriction on Plaintiff's ability to access the internet is reasonably related to the government's legitimate nonpunitive interests in rehabilitation and treatment of violent sexual predators held in civil detainment and that there is no evidence from which a reasonable juror could find otherwise. Accordingly, there is no genuine issue of material fact in dispute as to the constitutionality of the SORTS internet policy, and Defendants are entitled to summary judgment.

## III. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants' Motion to Strike Plaintiff's Affidavit [Doc. 101] is **GRANTED IN PART** and **DENIED IN PART**. With respect to Paragraph 9, the motion is **GRANTED**. With respect to Paragraphs 2, 4, 6, and 12, the motion is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [Doc. 83]

is **GRANTED**. A separate judgment will accompany this Memorandum and Order.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of September, 2026.